SEABOARD NEW YORK CORPORATION et al., Plaintiffs, *v.* ARTHUR W. WALLANDER, as Police Commissioner of City of New York, Defendant.

Supreme Court, Special Term, New York County, June 25, 1948.

*Samuel I. Rosenman, Max Freund, Ambrose Deskow, Alvin Gallen* and *William M. Ivler* for plaintiffs.

*John P. McGrath, Corporation Counsel* (*Morris W. Weiner, Saul Moskoff* and *Daniel Scannell* of counsel), for defendant.

PECORA, J.   In this action the plaintiff corporations seek an injunction, (1) to restrain the defendant, the Police Commissioner of the City of New York, and his subordinates, from seizing or threatening to seize certain slot machines — commonly called pinball machines — belonging to the plaintiffs, which are specifically referred to by name in the complaint; and (2) to restrain the police commissioner and his subordinates from interfering or threatening to interfere with the possession or operation of any of these pinball machines by the plaintiffs or by so-called location owners.   In the language of the pinball

machine business, a location owner is a person who owns or maintains a store or other establishment where pinball machines are placed, so that they may be made available for playing by the public.

The plaintiffs further seek a judgment directing that the police commissioner and his subordinates return to the plaintiffs all of such machines as have been heretofore seized by the police and which are still in their custody or control.

The plaintiffs Seaboard New York Corporation and Supreme Automatic, Inc., are both distributors and jobbers of certain of the slot machines set forth in the complaint. The plaintiff Allied Vending Corporation is both a jobber and an operator of these pinball machines. The plaintiff Hysol Amusement Corporation is a so-called operator.

A distributor is one who purchases the machines directly from their manufacturer, and then sells them, usually to jobbers or operators. A jobber may be described as a middleman, who buys the machines from distributors and in turn sells them, usually to operators. An operator may be described as one who purchases the machines from either a distributor or a jobber, and then arranges with so-called location owners to place the machines in the premises of the location owners. The arrangements between the operators and the location owners, according to the evidence before this court, usually involve an equal division of the proceeds derived from the playing of these machines by the public.

The complaint, in substance, alleges that the plaintiffs, as distributors, jobbers or operators, as the case might be, are the owners of the pinball machines referred to in the complaint; that such machines are coin slot machines having two principal methods of operation, one known as the plunger method, and the other as the manual roll down method; that such machines are not adapted and are not readily convertible so as to be adapted, in a manner that will enable them to be used or operated by the insertion of a coin, and by reason of any element of chance, so that the user may receive any money or thing of value, or an additional chance to use or operate the machine; and that these machines do not violate any of the provisions of section 982 of the Penal Law, nor of any other statute.

It further alleges that the plaintiffs have substantial financial investments in their respective pinball machine businesses, which are jeopardized and imperiled by the acts which they claim have been committed and are being committed by the defendant Police Commissioner of the City of New York.

It is further alleged that the police of this city, under the direction of the defendant Wallander, as Police Commissioner of the City of New York, have, since about the 17th of April, 1948, seized several thousands of these pinball machines throughout the city, belonging to the plaintiffs, from the premises of distributors, jobbers and location owners, and that these machines have a value of several hundred dollars each.

It also alleges that accompanying such seizures the police have baselessly arrested many persons and have caused the issuance of hundreds of summonses, charging persons with the violation of section 982 of our Penal Law, in connection with their possession of such machines.

The complaint further alleges that these actions of the police commissioner and of his subordinates are unlawful, and that they have attempted to harass and intimidate location owners, in an organized campaign to compel them to remove pinball machines from their premises, irrespective of whether such machines are in a form which violates the provisions of section 982 of the Penal Law.

Plaintiffs also allege that these acts on the part of the police have seriously interfered with the conduct of the legal business of plaintiffs, causing to them a substantial damage, for which the plaintiffs claim they have no adequate remedy at law. They further generally charge that the various acts of the defendant police commissioner and of his subordinates described in the complaint are arbitrary, unreasonable, capricious, unlawful and extra-legal.

The defendant police commissioner has interposed an answer, which in substance contains general denials of the allegations of the complaint and which also sets up fifteen separate and distinct affirmative defenses. I do not deem it necessary to enumerate or discuss all of the fifteen affirmative defenses set up by the defendant. I will, however, make reference to some of them.

The first affirmative defense alleges, in substance, that the machines of the plaintiffs violate section 982 of the Penal Law and that the plaintiffs themselves, by owning, possessing, leasing or selling these machines, also violate that statute.

The ninth separate and distinct defense pleads, in substance, that the plaintiffs' machines are so designed that the outcome of the games played thereon is essentially determined by chance rather than by skill.

In the tenth affirmative defense the commissioner alleges that the plaintiffs' machines are readily convertible into machines

which give the player a so-called free play, in violation of the provisions of subdivision 2 of section 982 of the Penal Law.

In his eleventh affirmative defense the commissioner alleges that the plaintiffs' machines violate the provisions of section 982 of the Penal Law because they are so constructed that they may readily be converted into the kind of devices which are prohibited by section 982.

In the twelfth affirmative defense it is alleged that the plaintiffs' machines constitute a violation of section 982 of the Penal Law because they are commonly used for gambling by means of so-called pay-offs which are given to players by the location proprietors.

In the thirteenth affirmative defense the defendant alleges that the plaintiffs' machines, the return of which is sought by plaintiffs in this action, are being held by the police as evidence for use in criminal prosecutions instituted against persons charged with the violation of section 982 of the Penal Law, and further alleges that under the provisions of sections 983, 984 and 985 of the Penal Law the police have no power to release such machines from their possession until the determination of the pending criminal prosecutions in connection with the institution of which such machines were seized by the police.

The issues raised by the pleadings revolve to a considerable degree around the question of what constitutes an illegal pinball machine, under the tests and definitions of illegality which are to be found in section 982 of the Penal Law. Under the provisions of paragraph (a) of subdivision 1 of that section, it is made unlawful to possess, sell or permit the operation of any slot machine or device of the kind defined in that section. Paragraph (b) of subdivision 1 makes it unlawful to make or permit to be made any agreement with reference to a slot machine whereby a person may become entitled to receive any money or thing of value.

Subdivision 2 of section 982 contains certain provisions from which it will be seen that in order for a machine or device to be a slot machine falling under the ban of the statute, it must be one that (a) either is adapted or may readily be converted into one that is adapted for use so that it operates as the result of the insertion of a coin, and (b) by reason of an element of chance or other unpredictable outcome, the user may receive or become entitled to receive money, a thing of value, or additional rights to use the machine. The reference to additional rights in the statute is an opportunity which, in the vernacular of the

pinball machine business, calls for the enjoyment of a free play of the machine by the user.

It is not sufficient, however, for a pinball machine merely to be convertible into a free-play machine in order to fall under the condemnation of the statute. To do so, it must be '' readily '' so convertible.

The learned counsel for the plaintiffs has frankly conceded that if the pinball machines involved in this action may readily be converted into so-called free-play machines, they would violate the provisions of section 982, even if their actual physical conversion has not been made.

I have undertaken to follow the evidence presented to this court with close care. I have given very earnest consideration to all of the arguments that were so capably presented to the court by the learned and industrious counsel representing the various parties to this litigation. I have carefully read their elaborate briefs, and they have given me much understanding with respect to the legal principles involved in this case.

It is my opinion that the evidence convincingly proves that all of the machines of the types described in the complaint are readily convertible into so-called free-play machines by the mere attachment of relatively simple parts to the machines. The testimony of John T. Gibala, an assistant chief engineer of the police department, was, in my opinion, well-nigh conclusive upon that issue. When he was challenged in the course of his cross-examination by the learned counsel for the plaintiffs to make conversions such as he testified could be made to these machines, Gibala, during the trial, gave dramatic demonstrations in the courtroom of the speed and the ease with which the conversion of these machines into free-play types could be effected. In one instance the physical process of the conversion required only three minutes and fifty seconds. In another instance it required between six and seven minutes. I am not unmindful of the fact that the parts which were affixed to the machines in the course of these demonstrations by the witness Gibala had already been previously put together in units; but the evidence shows that such units could be assembled in less than fifteen minutes' time, and that the component parts of those units could freely be purchased in the open market. In fact, the evidence strikingly showed that some of these free-play parts, already assembled in units, could be purchased directly from some of the manufacturers of the machines, from catalogues distributed by them, which fully described the respective parts and quoted the prices therefor,

Even the electrical engineers who testified for the plaintiffs eventually admitted, in the course of their respective cross-examinations, that conversions of the kind described by the defendant's witness Gibala could be effected within about twenty minutes' time.

Upon the evidence this court has no hesitation in finding and in holding that the machines which are the subject of this action are in violation of section 982 of the Penal Law. This factual finding in itself is sufficient to warrant this court in denying to the plaintiffs the equitable relief which they seek in this action.

There are other considerations arising from the evidence which justify this court of equity in denying to the plaintiff, Seaboard New York Corporation, the relief which it seeks. The testimony of the president of that corporation included admissions that his company, as a distributor and jobber of pinball machines, sells or has sold illegal free-play machines in communities within the State of New York but outside the city of New York. With this avowal of that plaintiff's violations of section 982 of the Penal Law, that plaintiff certainly does not come into this court of equity with the clean hands that would entitle it to the equitable relief which it seeks. I am aware of the testimony given by that witness in which he sought to excuse, justify or palliate such illegal sales by the claim that those sales were made in communities within the State other than the city of New York, where local ordinances permitted such sales. While the specific ordinances referred to were not brought to the attention of the court, it is obvious that no local ordinance can override the provisions of a penal statute enacted by our State Legislature.

I deem it pertinent to make some detailed references to the allegations in the complaint which charge the police commissioner of this city with arbitrary, unreasonable, unlawful, capricious or extra-legal acts or conduct. Considerable testimony was given by Police Commissioner Wallander during the course of the trial. Most of that testimony was elicited by the learned counsel for the plaintiffs, who originally put the commissioner on the stand. It is my belief that the testimony given by the commissioner is credible, and it showed that the acts alleged to have been committed by him arbitrarily and unlawfully were performed after he had had conferences with the District Attorneys of the counties embraced within the Greater City of New York. It was also shown that he acted upon advice conveyed to him by the engineering staff of his department, to the effect that

the machines described in the complaint are readily convertible into so-called free-play machines.

Testimony was given by the District Attorney of Kings County and by an assistant district attorney of Bronx County showing that they had conferred with the police commissioner shortly prior to April 17, 1948, and advised him, out of the wealth of their experience as law enforcement officers in their respective counties, that in their opinion there was a close relationship between the operation of pinball machines in this city and the increase in juvenile delinquency, as well as in the commission of many serious crimes of violence, including those of a racketeering nature, and even of murder. The testimony given by these able prosecuting officials was quite impressive, although their testimony might effectively be used to base arguments addressed to legislative bodies to outlaw all pinball machines as constituting a social evil.

I am definitely persuaded by the evidence that the conduct of Commissioner Wallander described in the complaint as being arbitrary, unreasonable, unlawful, capricious or extra-legal, was instead the conduct of an efficient public officer, conscientiously seeking to discharge his difficult and important duties in a manner and with a spirit actuated by honest and laudable motives on his part.

Our city, with its teeming population of approximately eight million souls, is generally regarded as the most cosmopolitan city in the world. Practically every language known to mankind is spoken here by its people; every form of religious worship is followed by them; every racial strain is represented among them. While these elements contribute largely to the greatness of our city, they also serve to complicate and enhance the difficulties in the discharge of their duties by our law enforcement officers and agencies. In the performance of their tasks, police officials are often called upon to act with the kind of judgment which must be formed in the face of emergent situations, and not with the cool, well-reasoned judgment which may be given to the solution of a problem where there is adequate time for mature deliberation. Under these circumstances it is only fair, it seems to this court, that reasonable allowance should be made for law enforcement officers where they exercise a faulty, but honest, judgment in the well-intentioned performance of their work. Courts which are, in the ultimate analysis, the guardians of the liberty of our people, should not, of course, tolerate any conduct, even by police authorities, which is extra-legal, and which is arbitrarily, viciously, or wantonly committed;

for such conduct, if unrestrained, might tend toward the development or creation of a police state. The unwarranted and oppressive acts of police officers should in proper cases be curbed by the courts, to the end that the freedoms guaranteed to our people by the fundamental law of the land may not become jeopardized or lost. But where the conduct of police authorities represents honest and sincere efforts to enforce the law and to protect public morals and safety, it should not lightly be characterized as arbitrary or unreasonable, and made the basis for the granting of injunctive relief by the court.

In connection with the kind of police duty which has been the subject of this action, it seems to me that the thousands of men who constitute the personnel of the police department of our city cannot reasonably be expected to possess that technical knowledge of the electrical mechanism and circuits of pinball machines which can only be acquired by special education in the field of electrical science. The testimony in this case shows clearly that the external appearance of admittedly illegal free-play pinball machines, and of nonfree-play machines, is substantially the same. Hence, to grant the kind of injunctive relief which plaintiffs here seek against the police commissioner and the personnel of his department, would seriously hamper the police in their sincerely intended efforts to enforce such statutes as section 982 of the Penal Law. This court, upon the record before it, will not thus weaken the power of the members of our police department, nor will it shorten their arms in their efforts to enforce the law.

There are further reasons why the relief sought by plaintiffs here should not be granted. Those reasons are to be found in the provisions of sections 983, 984 and 985 of the Penal Law. Section 983 makes it the duty of police officers to seize any machine which violates section 982. That section further provides that whenever a police officer makes an arrest of, or serves a summons upon, one charged with the possession of a machine in violation of section 982, he must seize the machine and take it into official custody.

Under the provisions of sections 984 and 985, if the magistrate or justice before whom a defendant is brought charged with a violation of section 982, holds the defendant for trial, he must cause the machine to be delivered to the District Attorney of the proper county, for use as evidence in the prosecution. If the machine is seized as being in violation of section 982, without an accompanying arrest, or if the arrest was made but the

magistrate does not hold the defendant for trial, the magistrate must determine whether the machine violates section 982, and if in his opinion it does, then he must cause the immediate destruction of the machine.

In view of these provisions of sections 983, 984 and 985 of the Penal Law, this court does not feel justified in granting to the plaintiffs any injunctive relief or any other relief which would interfere with the due prosecution in the Magistrate's Court or the Court of Special Sessions of cases arising under section 982 of the Penal Law. Neither will this court of equity make any determination which would prevent the Magistrates' Courts and the Court of Special Sessions from exercising the powers specially conferred upon them by sections 984 and 985 to determine in which cases seized pinball machines shall be returned to their owners, and in which cases they shall be destroyed.

The principle which should be applied by courts of equity in proceedings in which it is sought to restrain the acts of police officers is tersely stated in the *per curiam* opinion of the Court of Appeals in the case of *Triangle Mint Corporation* v. *Mulrooney* (257 N. Y. 200). The court there said: "An equity court should exercise its jurisdiction to restrain the police from enforcing a criminal statute, the enforcement of which threatens property damage, only in cases where a clear legal right to that relief is established."

On the same day that the Court of Appeals handed down its decision in the *Triangle Mint Corporation* case (*suprà*) it decided the case of *People* v. *Jennings* (257 N. Y. 196, 199). In its opinion in that case, written by the late Chief Judge CRANE, the court said: "We have had other cases before us involving like machines and the propriety of a court of equity interfering by injunction with the police in seizing such machines as gambling implements. The discretion of the court in such a matter is to be wisely and deliberately exercised. The evidence above referred to, indicating the readiness with which an innocent contrivance may be turned into a gambling device, may be relevant and competent in moving the court not to interfere with the police."

With these statements of the applicable principle by our highest court for its guidance, and upon a full consideration of all of the evidence which has been placed before it, this court feels imperatively constrained to grant the motion of the defendant dismissing the complaint in this action, and each cause of action therein pleaded.

It, therefore, awards judgment in favor of the defendant dismissing the causes of action of each plaintiff, with costs; except, however, that in the case of the plaintiff Allied Vending Corporation, its cause of action will, on the motion of its own counsel, unopposed by the corporation counsel, be permitted to be discontinued, with prejudice but without costs.

The foregoing will constitute the formal decision of the court, thereby rendering unnecessary the making of formal findings and conclusions. Settle judgment in accordance with this decision.